# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | | |
|---|---|---|
| UNTIED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | NO. 08-20028 |
| | ) | |
| TERRANCE LEWIS, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

On January 30, 2008, the Defendant Terrance Lewis was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) (D.E. # 1). Before the Court is Defendant's May 5, 2008 Motion to Suppress Evidence that resulted from the search of Defendant's person conducted on October 18, 2007, and any statements Defendant may have made during this search (D.E. # 18). The United States has responded (D.E. # 21), and a hearing was held on August 27, 2008. This motion is now ripe for disposition. For the following reasons, the motion is **DENIED**.

### BACKGROUND

At approximately 1:30 P.M. on October 18, 2007, approximately five (5) to seven (7) officers of the Memphis Police Department were in an area known for high-drug trafficking activity investigating a drug complaint at 214 Frank (D.E. # 21 at 2).[1] Upon arrival at the

---

[1] Although neither the Defendant in his Motion to Suppress nor the Government in its Response cited the exact number of officers present during the incident, Officer Darnell Gooch testified to this at the hearing on the matter.

1

complaint's location, the officers noticed several male individuals standing in an open area next to the house located at 214 Frank (*Id.*). Seeing several of these individuals were displaying colors and/or tattoos commonly associated with criminal gangs, the officers concluded based on their experiences that the individuals were either prior or current gang members (*Id.*).

Without a warrant, the officers began to approach the individuals, when Officer Darnell Gooch noticed Defendant "suddenly place his hand in his pants pocket" (*Id.*). As Defendant removed his hand, Officer Gooch observed what appeared to be a magazine clip (*Id.*). "[F]earing for his and the other officers' safety," Officer Gooch ordered the males to remove their hands from their pocket (*Id.*). He approached Defendant and inquired whether he possessed any weapons, to which Defendant responded no, but that he does carry a gun when working as a bodyguard at a local strip club (*Id.*). Officer Gooch then conducted a pat-down search and recovered a magazine clip loaded with fourteen live rounds of 9mm ammunition (*Id.*). At some point prior to discovering the magazine clip, the officers verified that Defendant was a convicted felon, thus upon recovery of the live ammunition, they gave Defendant his *Miranda* warnings and prepared a waiver form, but Defendant refused to give a statement (*Id.*). The officers then conducted a search of the surrounding areas, but a gun was never found.[2] Defendant was not arrested and was released at the scene (*Id.*). According to Officer Gooch, the whole incident took about thirty (30) minutes, and he never unholstered his gun.[3]

At the hearing on this matter, several individuals gave conflicting testimony as to whether Defendant was placed in handcuffs during this incident. In particular two (2) of Defendant's

---

[2] Officer Gooch testified to this at the hearing.

[3] Officer Gooch testified to this at the hearing.

witnesses stated that he was, while one (1) of Defendant's witnesses stated they never saw Defendant handcuffed and never saw Defendant searched; however, Officer Gooch testified that Defendant was never placed in handcuffs.

Defendant now alleges the magazine clip recovered from Officer Gooch's pat-down search should be suppressed as the result of a warrantless search conducted without an applicable exception, as should any comments made during this search as fruit of the poisonous tree (D.E. # 18 at 3). Defendant also seems to argue that any comments made prior to the *Miranda* warning should be suppressed as a violation of *Miranda*'s procedural safeguards (*Id.*).

## **ANALYSIS**

I.  The Pat-Down Search

The Sixth Circuit has identified three general types of permissible, warrantless encounters between the police and citizens: "(1) [T]he consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause."[4]

The Supreme Court has stated that "even when officers have no basis for suspecting a particular individual [of criminal activity], they may generally ask questions of that individual, ask to examine that individual's identification, and request consent to search... - so long as the police do not convey a message that compliance with their requests is required."[5] In other words, "law enforcement officers may approach individuals and ask general questions without having

---

[4] *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000).

[5] *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991).

any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that [they were] not free to leave."[6]

Investigative detentions, also known as a *Terry* "stop and frisk," are brief intrusions predicated on the policy that police officers investigating crimes should not be required to take unreasonable and unnecessary risks in the performance of their duties.[7] In *Terry*, the Supreme Court held that:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.[8]

---

[6] *Waldon*, 206 F.3d at 603; *see also United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008). Determining if an encounter is consensual must be based on the officer's objective behavior, not the officer's subjective suspicion of criminal activity. *Davis*, 514 F.3d at 607 (*citing Waldon*, 206 F.3d at 584 ("We know of no legal precedent suggesting a police officer can engage in a consensual encounter only with citizens whom he does not suspect of wrongdoing.")); *see also Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business."). Additionally, an encounter that begins "as an attempt by the police to consensually obtain...information...[may] develop[] into circumstances in which an investigative detention [is] justified." *United States v. Kimber*, 33 Fed. Appx. 717, 720 (6th Cir. 2002).

[7] *Terry v. Ohio*, 392 U.S. 1, 23 (1968).

[8] *Id.* at 30-31 ("When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.").

4

The fundamental inquiry under *Terry* is whether officers "have a particularized and objective basis for suspecting the particular person stopped of criminal activity."[9] Assessing whether an officer possesses particularized, objective suspicion requires a twofold analysis.[10] "First, the assessment must be based on the totality of the circumstances known to the officers at the time of the stop."[11] Under this "totality of the circumstances" rubric, officers may "draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"[12] Second, this assessment must "arouse a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime."[13] Reasonable suspicion must consist of more than an "inchoate and unparticularized suspicion" or a "hunch" that criminal activity is afoot.[14] However, reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."[15]

---

[9] *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

[10] *Id*. at 418.

[11] *Id.* (explaining that "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers" is just some of the "data, [from which] a trained officer draws inferences and makes deductions-inferences and deductions that might well elude an untrained person").

[12] *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (*citing Cortez*, 449 U.S. at 417-18).

[13] *United States v. Montero-Camargo*, 208 F.3d 1122, 1129-30 (6th Cir. 2000) (*citing Cortez*, 449 U.S. at 418).

[14] *Arvizu*, 534 U.S. at 274 (*citing Terry*, 392 U.S. at 27).

[15] *Wardlow*, 528 U.S. at 123 (*citing United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *see also Arvizu*, 534 U.S. at 273 ("Because the 'balance between the public interest and the individual's right to personal security,' tilts in favor of a standard less than probable cause in

Although the Supreme Court has "deliberately avoided reducing [the reasonable suspicion analysis] to a 'neat set of legal rules,'" there are several frequently recurring factors that may aid in determining whether an officer possessed the requisite reasonable suspicion to conduct a *Terry* stop or pat-down search.[16] The most frequently recurring factors utilized in the Sixth Circuit's analysis include: (1) nervous/evasive behavior,[17] (2) furtive movements made in response to police presence,[18] (3) the speed of a suspect's movements,[19] (4) presence in a high-crime area,[20]

---

such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity [may be occurring]." (*quoting United States v. Brignoni-Ponce*, 422 U.S. 873, 818 (1975)).

[16]  *Arvizu*, 534 U.S. at 274 (*quoting Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

[17]  *United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) (*citing United States v. Wardlow*, 528 U.S. at 124 (recognizing that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion")); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975).

[18]  *Caruthers*, 458 F.3d at 466 (stating that "[f]urtive movements made in response to a police presence may also properly contribute to an officer's suspicion"). Along these lines the Sixth Circuit has stated that "[b]ending or leaning tends to be more suspicious when accompanied by some other indication of an attempt to conceal contraband or to reach for a weapon, such as arm movements or the sound of an item being moved." *Id.* at 467. Thus, bending or leaning, "while susceptible to an innocent explanation…[may] be reasonably viewed as an attempt to conceal a weapon and/or other contraband material, such as narcotics…." *Pearce*, 531 F.3d at 382 (dicta) (noting that a high crime area plus actions suggestive of carrying a gun may be the basis of reasonable suspicion; whereas, these factors alone may not).

[19]  *Id.* at 466 ("Given that simply walking away from the police does not give rise to reasonable suspicion, we agree that 'the speed of the suspect's movements may be relevant in the totality of the circumstances.'" (*quoting United States v. Gordon*, 231 F.3d 750, 757 (11th Cir. 2000)).

[20]  *Id.* at 467-68.

and (5) the time of day.[21] Additionally, the Sixth Circuit has indicated that whether officers are dealing with a drug investigation may be appropriately considered as part of the justification for a *Terry* pat-down "given the frequency with which drug dealers arm themselves."[22]

In assessing these factors, the Sixth Circuit has warned against over generalization.[23] In particular, the court has stated "a 'high-crime' area factor is not [to be] used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but [should be] limited to specific circumscribed locations where particular crimes occur with unusual regularity."[24] The court suggested that the high-crime area factor should be limited (1) "to a specific intersection rather than an entire neighborhood," (2) to specific "crimes that frequently occur in the area," and (3) to frequently occurring crimes that relate to the reason the individual was stopped.[25] However, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."[26]

---

[21] *United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008) (stating that a late hour may contribute to the analysis; however, 10:30 P.M. is "not late enough to arouse suspicion of criminal activity," while 1:00 A.M. may be).

[22] *United States v. Paulette*, 457 F.3d 601, 606 (6th Cir. 2006).

[23] *See Caruthers*, 458 F.3d at 467.

[24] *Id.* (quoting *United States v. Montero-Camargo*, 208 F.3d at 1138 (stating that "labeling an area high-crime raises special concerns of racial, ethnic, and socioeconomic profiling")).

[25] *Id.* at 468.

[26] *Wardlow*, 528 U.S. at 124 (noting that the occurrence of an investigative stop in area of high-crime is a relevant contextual consideration in the *Terry* analysis).

Once an officer determines a *Terry* stop is necessary, he "may conduct 'a reasonable search for weapons...where he has reason to believe that he is dealing with an armed and dangerous individual.'"[27] However, if the individual subsequently is arrested or his vehicle is searched, the officer must possess probable cause that a criminal offense has or is being committed, based on the reasonable conclusions that he or she could draw from the facts known at that time.[28] Additionally, the actions of police officers conducting a *Terry* stop should "not be 'more intrusive than necessary to effectuate an investigative detention,'" but should be sufficiently limited to actions necessary to "'verify or dispel the officer's suspicion in a short amount of time.'"[29] Thus, when officers reasonably fear detained suspects may be armed and dangerous they may order them from their car, draw their weapons, place them in a police cruiser, or even use handcuffs, so long as the "the circumstances warrant that precaution."[30] Any evidence seized as the result of an unlawful search or arrest is inadmissible under the exclusionary rule, as is any evidence derivatively obtained from an unlawful search or arrest as "fruit of the poisonous tree."[31]

---

[27] *Id.* at 380 (*quoting Terry*, 392 U.S. at 27) (alteration in original).

[28] *Id.* (*citing Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).

[29] *United States v. Walker*, No. 94-3521, 1995 WL 141343, at *5 (6th Cir. Mar. 31, 1995); *see also Houston v. Clark County Shreriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999).

[30] *Houston*, 174 F.3d at 814-15 (listing a number of cases from other circuits who have held similarly).

[31] *Pearce*, 531 F.3d at 381 (*citing Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

Without probable cause police officers may detain individuals when they have a "reasonable and articulable suspicion that the suspect is engaged in criminal activity," thus Officer Gooch along with the other officers were within the rule outlined by *Terry* when they detained Defendant pursuant to a drug complaint investigation and Officer Gooch's observation of a potential gun clip.[32] Additionally, under *Terry* and the Sixth Circuit's "reasonable suspicion" analysis, Officer Gooch had an "objectively reasonable suspicion that 'his safety or that of others was in danger,'" when they conducted the pat-down search on Defendant.[33]

First, the officers observed that they probably were dealing with several members of criminal gangs, and in making a determination of reasonable suspicion, the officer's "own experience and specialized training" may be taken into consideration.[34] Second, Defendant was standing in an open area directly adjacent to the location that submitted the drug complaint the officers were investigating. Third, while the incident's occurrence in an area of high-crime alone is not enough to find reasonable suspicion, when coupled with these other considerations, this factor should be included in the reasonable suspicion analysis.[35] Fourth, Defendant's sudden, furtive movement towards his pocket and Officer Gooch's observation of what appeared to be a protruding magazine clip, may have been "reasonably viewed as an attempt to conceal a weapon,"

---

[32] *See Waldon*, 206 F.3d at 603. It should be noted that officers may also approach individuals without possessing any suspicion of criminal behavior to ask general questions, so long as they do not make indications that a response is required and that the suspect is not free to go. *Id.*

[33] *Id.* at 382 (*quoting Terry*, 391 U.S. at 27).

[34] *See Terry*, 392 U.S. at 27.

[35] *See id.* ("Contextual considerations…may not without more, give rise to reasonable suspicion, [but] they are relevant to the reasonable suspicion calculus.")

9

necessitating a pat down search for safety.[36] Further, "given the frequency with which drug dealers arm themselves," and the fact that officers were investigating a drug complaint, their protective search was justified.[37] Although the 1:30 p.m. timing of the incident may distinguish this case from others, based on the totality of the circumstances, the facts favor a finding of reasonable suspicion.[38]

Additionally, despite the contradictory testimony as to whether Defendant was placed in handcuffs, under the Sixth Circuit's current analysis, placing handcuffs on Defendant during this search would not have been so overly intrusive to exceed the scope of the *Terry* stop.[39] This becomes apparent when considering that Officer Gooch believed he had seen a magazine clip, was in an area of high crime, and was investigating a drug complaint among several potential criminal gang members.[40] Thus, since Officer Gooch possessed reasonable suspicion to detain Defendant pursuant to their investigation and then conduct a *Terry* pat down search for officer

---

[36] *See Pearce*, 531 F.3d at 382; *see also Arvizu*, 534 U.S. at 227 ("A determination that reasonable suspicion exists…need not rule out the possibility of innocent conduct."); *Caruthers*, 458 F.3d at 464 ("Bending or leaning tends to be more suspicious when accompanied by some other indication of an attempt to conceal contraband or to reach for a weapon, such as arm movements or the sound of an item being moved.").

[37] *See Paulette*, 457 F.3d at 606.

[38] *See Blair*, 524 F.3d at 752 (stating that "a late hour may contribute to reasonable suspicion"); *Caruthers* 458 F.3d at 464-66 (noting that the speed of the suspect's movements is a factor to be considered).

[39] *See Houston*, 174 F.3d at 814-15.

[40] *See id.*

safety, the subsequent discovery of a magazine clip should not be excluded as the result of an unlawful search, nor should any statements made as fruit of the poisonous tree.[41]

II.     Defendant's Statement

The Fifth Amendment states that a defendant may not be "compelled in any criminal case to be a witness against himself."[42]  In *Miranda v. Arizona,* the Supreme Court held that in order to protect this Fifth Amendment right a suspect subject to custodial interrogation must first be given notice of his or her right against self-incrimination.[43]  However, police are obliged to administer *Miranda* warnings only "where there has been such a restriction on a person's freedom as to render him 'in custody,'"[44] which means "there must be a formal arrest or restraint on freedom of movement of the degree associated with formal arrest'"[45] or a "coercive context tantamount to custody."[46]  Statements obtained during a custodial interrogation in violation of *Miranda* are inadmissible for certain purposes during a criminal trial.[47]

---

[41]     *See Pearce*, 531 F.3d at 381.

[42]     U.S. Const. amend. V.

[43]     384 U.S. 436, 478-79 (1966)

[44]     *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).

[45]     *United States v. Mahan*, 190 F.3d 416, 421 (6th Cir. 1999) (*quoting Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

[46]     *United States v. Salvo*, 133 F.3d 943, 953 (6th Cir. 1998).

[47]     *Miranda*, 384 U.S. at 479.

Officers with no suspicion of criminal activity may ask individuals general questions, as long as they do not behave in a way that connotes restraint on the individual's freedom.[48] However, during an investigatory detention

> The officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions[, b]ut the detainee is not obliged to respond. And, unless the encounter provides the officer with probable cause to arrest him, he must then be released.[49]

In determining the permissible interplay between an investigative detention and a custodial interrogation, the Sixth Circuit has stated:

> The very nature of a *Terry* stop means that a detainee is not free to leave during the investigation, yet is not entitled to *Miranda* rights. Therefore, the pertinent question is whether [the suspect] was "in custody" during the investigatory detention for the purposes of determining whether his Fifth Amendment rights were violated.
>
> In determining whether a defendant was subject to custodial interrogation we look to the totality of the circumstances "to determine 'how a reasonable man in the suspect's position would have understood the situation.'" The "ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[50]

Thus, the first factor considered in custodial determinations is whether the individual would have felt free to leave, and "in the context of a *Terry*-style investigatory detention, a person is not free to leave, at least temporarily."[51] Other relevant considerations are:

> (1) [T]he purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so;

---

[48] *See Davis*, 514 F.3d at 607.

[49] *United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003).

[50] *Id.* at 528-29.

[51] *Id.* at 529.

12

whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or acquiesced to their requests to answer some questions.[52]

Furthermore, statements volunteered by a suspect while subject to an investigatory detention are not obtained in violation of *Miranda*.[53] And under certain exceptional circumstances, the police are not required to give *Miranda* warnings even though a suspect may be subject to a custodial interrogation.[54]

One such exception is the "public-safety" exception as outlined by the Supreme Court in *New York v. Quarles*.[55] In *Quarles* several on-duty officers were stopped by a female, claiming she had been raped. She then described the individual and informed them that he was armed and could be found at a grocery store a short distance away. Seeing a man meeting her description at the location she had given, the police began to approach him, but he started to run. After a short chase they apprehended him, handcuffed him, and asked the location of his gun without administering *Miranda* warnings.[56] The Supreme Court concluded that these facts were

---

[52] *Id*. (*quoting United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998)).

[53] *Miranda*, 384 U.S. at 478 ("Any evidence given freely and voluntarily without any compelling influences is, of course, admissible into evidence."); *see also Thomas*, 142 Fed. Appx. 896, 899 (6th Cir. 2005) (declining to suppress statements the defendant had voluntarily made while detained by police, because they were not the "functional equivalent of [police] questions"). Additionally, in *United States v. Clark*, the court determined that to the extent the defendant's statements went beyond the scope of the officers "booking questions," the statements were voluntary utterances. 982 F.2d 965, 968 (6th Cir. 1993).

[54] *New York v. Quarles*, 467 U.S. 649, 655 (1984) (adopting a "public-safety" exception to the *Miranda* warnings); *see also United States v. Robinson*, No. 05-6904, 2007 WL 507875, at *3 (6th Cir. Feb. 16, 2007).

[55] 467 U.S. 649.

[56] *Id.* at 651-52.

13

indicative of custodial interrogation for purposes of *Miranda*, as the defendant was handcuffed and surrounded by several officers when questioned.[57] However, they also concluded *Miranda* includes a "public-safety" exception:

> [T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers...in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.[58]

The Supreme Court went on to state that in balancing the social and individual interest involved in these specific circumstances, "police officers can and will distinguish...between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect."[59]

In interpreting the *Quarles* decision, the Sixth Circuit has held that officers may rely on the public-safety exception only when they have an objectively reasonable belief, based on

---

[57] *Id.* at 655 (stating "[t]he New York Court of Appeal was undoubtedly correct in deciding that the facts of this case come within the ambit of *Miranda* decisions....We agree that respondent was in police custody because we have noted...Quarles was surrounded by at least four police officers and was handcuffed when the questioning at issue took place.").

[58] *Id.* at 657-58. *But see Dickerson v. United States*, 530 U.S. 428, 444 (2000) (holding that the decision in *Miranda* was itself constitutionally-based as opposed to a mere prophylactic designed to protect constitutionally-based rights); *see also United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001) (stating that although the "*Quarles* court seemed to justify the public safety exception to *Miranda* by distinguishing between prophylactic and constitutional rights....*Quarles* remains good law" (citations omitted)).

[59] *Quarles*, 467 U.S. at 658-59.

14

articulable facts, that they are in danger,[60] regardless of the officer's subjective state of mind.[61] In applying this exception, courts should address the following factors: "[T]he known history and characteristics of the suspect, the known facts and circumstances of the alleged crime, and the facts and circumstances confronted by the officer when he undertakes the arrest."[62] Additionally, the Sixth Circuit has stated:

> For an officer to have a reasonable belief that he is in danger, at minimum, he must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it. The public safety exception applies if and only if both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety.[63]

In the case at bar, the Court finds that if Defendant was in handcuffs, then for purposes of *Miranda*, he was subject to a custodial interrogation; however, regardless of the custodial nature of the incident, any statements made in response to the officers' questions regarding whether Defendant was armed are subject to the public-safety exception.

Because we know Defendant was not formally arrested, determining the custodial nature of this situation is dependent on whether Defendant was restrained to a degree associated with formal arrest, as defined by "how a reasonable person in the suspect's position would have

---

[60] *Talley*, 275 F.3d at 563.

[61] *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007).

[62] *Id.*

[63] *Id.* Furthermore, although "evidence of pretext goes most directly to the officer's subjective beliefs (rather than the objective reasonableness of those beliefs), [courts should] consider such evidence to the extent that it informs [their] understanding of the objective circumstances. Generally, the fact that an officer was willing to manipulate the scene of an arrest in order to gather evidence makes it unlikely that he could have formed an objectively reasonable belief that he was in danger." *Id.* at 429-30.

understood the situation."[64] When Officer Gooch conducted the investigatory detention of Defendant, Defendant was not free to leave, at least temporarily.[65] Although the question was benign, i.e. officer/public safety; the locale was relatively non-coercive; and the length was not overly long (the whole incident taking only thirty (30) minutes), because Defendant was not informed answering was voluntary, did not have unrestrained freedom of movement, and did not initiate contact, but instead acquiesced, to err on the side of caution and for purposes of *Miranda*, Defendant was subject to custodial interrogation.[66] Furthermore, two witnesses to the incident saw Defendant handcuffed and surrounded by several officers during the time of interrogation. Under the totality of the circumstances, a reasonable person in Defendant's position would not have felt free to leave, as this sort of restraint rises to the level associated with formal arrest or created a coercive context tantamount to custody.[67]

However, despite the custodial nature of the questioning, Defendant's answers to Officer Gooch's questions should not be suppressed, because the officer's conduct was well within the parameters of the public-safety exception to *Miranda*.[68] In considering the facts, circumstances,

---

[64]     *Id.*

[65]     *Swanson*, 341 F.3d at 529 ("[I]n the context of a *Terry*-style investigatory detention, a person is not free to leave, at least temporarily. Thus, the first factor in the [*Miranda*] determination weighs in favor of defining...detention [of a suspect subject to a *Terry* stop] as a custodial interrogation.").

[66]     *See Id.* at 530 (outlining the factors to be considered in determining whether individuals subject to a *Terry* stop are "in custody" for purposes of *Miranda*).

[67]     *See Quarles*, 467 U.S. at 655 (finding that the defendant was "undoubtedly" in custody, when he was questioned in a grocery store while handcuffed and surrounded by four (4) police officers); *Swanson*, 341 F.3d at 529.

[68]     *See Quarles*, 467 U.S. at 657-59; *Williams*, 483 F.3d at 428 (holding that upon seeing a magazine clip, an officer was entitled to ask the location of a gun pursuant to *Miranda*'s

and characteristics of the investigation, the situation presented to the officers was less than ideal: (1) the officers were investigating a drug complaint, a situation the Sixth Circuit has recognized often involves investigating armed individuals;[69] (2) the investigation presented the officers with multiple potential criminal gang members;[70] and (3) one of the officers thought he had just seen ammunition for a gun.[71] Additionally, given the characteristics of the investigation's locale and the fact the officers were dealing with multiple individuals, the officer's situation was riddled with variables. Based on these facts Officer Gooch had a reason to believe that (1) Defendant "might have (or recently have had a weapon), and (2) that someone other than police might gain

---

public safety exception). Alternatively, the Court notes that to the extent that any part of Defendant's response to Officer Gooch's question was outside the question's scope, the statement may be considered voluntary, and voluntary statements do not trigger *Miranda*. *Clark*, 982 F.2d at 968 (applying the "booking questions" exception to *Miranda*, which states that officers gathering routine biographical data for booking purposes are not required to administer *Miranda* warnings, where the Sixth Circuit found that an interrogation was not subject to *Miranda*, because the defendant's responses were outside the scope of the officer's "booking questions"). Because Defendant's answer to Officer Gooch's question regarding gun possession was responsive, although this is certainly a question of fact over which reasonable minds could differ, and again to err on the side of caution, the Court does not find Defendant's statement to be a voluntary admission, outside the scope of Officer Gooch's questioning and thus outside the scope of *Miranda*. *Id.* Additionally, Defendant's case is somewhat distinguishable from the Sixth Circuit's analysis in *Clark*, where the court found the defendant's statements were voluntary, when they were made fifteen (15) minutes after the officer had concluded his booking questions. *Id.* From the Memoranda filed regarding the current motion, it appears that little to no time had elapsed between Officer Gooch's question and Defendant's answer. *See id*.

[69] *See Williams*, 483 F.3f at 428 (holding a factor in the public-safety exception analysis is "the known facts and circumstances confronted by the officer when undertakes the [investigation]"); *Paulette*, 457 F.3d at 606 (stating that *Terry* searches are often necessary when investigating potential drug dealers as drug dealers often arm themselves).

[70] *See Williams*, 483 F.3f at 428 (holding a factor in the public-safety exception analysis is "the known facts and characteristics of the suspect").

[71] *See id.* (holding a factor in the public-safety exception analysis is "the known facts and circumstances of the alleged crime").

17

access to that weapon and inflict harm with it."[72] Thus, the public-safety exception is applicable, as the "context-specific evidence [creates] the inference that [Officer Gooch] reasonably could have perceive[d] a threat to public safety," and as such, Officer Gooch's question was not made in violation of *Miranda*, and Defendant's response should not be suppressed.[73]

## CONCLUSION

Because Officer Gooch possessed a reasonable, particularized suspicion based on the totality of the circumstances that Defendant was armed and presently dangerous, and because Officer Gooch's questions were within the ambit of *Miranda*'s public safety exception, Defendant's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED**.

                                            **s/ S. Thomas Anderson**
                                            S. THOMAS ANDERSON
                                            UNITED STATES DISTRICT JUDGE

Date: November 5th, 2008.

---

[72] *See id*.

[73] *See id*.